## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| GREGORY WINOKUR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CRAIN COMMUNICATIONS INC.,<br><br>Defendant. | Case No. 20-cv-13357<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gregory Winokur ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1.      Defendant Crain Communications Inc. ("Crain") rented, exchanged, and/or otherwise disclosed personal information about Plaintiff's *Autoweek* magazine subscriptions, from within the State of Michigan, to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed their information to aggressive advertisers, non-profit organizations, and other third-party companies.  As a result, Plaintiff has received a barrage of

unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing

Plaintiff's Personal Reading Information (defined below), Crain violated

Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess.,

P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg.

Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[1]

2.    Crain also sold, rented, and/or otherwise disclosed, from within the

State of Michigan, the Personal Reading Information of its other subscribers to

*Autoweek* magazine, also in violation of the PPPA.

3.    Documented evidence confirms these facts.  For example, a list

broker, Nextmark, offers to provide renters access to the Personal Reading

Information of 162,819 U.S. subscribers to *Autoweek* magazine (as of May 9,

2019), at a base price of "$105.00/M [per thousand]," (i.e., 10.5 cents apiece), as

shown in the following screenshot of the "AUTOWEEK Mailing List" page on

---

[1] In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th
Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et
seq.*). The May 2016 amendment to the PPPA, which became effective on July 31,
2016, does not apply retroactively to claims that accrued prior to its July 31, 2016
effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41
(S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to
Plaintiff's claims, and the Court will assess the sufficiency of those claims under
the law as it was when Plaintiff's claims accrued.") (citing *Landgraf v. USI Film
Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and
thus vested, prior to the July 31, 2016 effective date of the amended version of the
PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v.
GameStop, Corp.*, No. 18-cv-00596-GJQ-PJG, Dkt. 18 at 3-5 (W.D. Mich. 2018).

Nextmark's website:



*See* **Exhibit A** hereto.

4.      Renters of the "AUTOWEEK Mailing List" are able to access the

Personal Reading Information of each *Autoweek* magazine subscriber based on, but

not limited to, the subscriber's gender.

3

5.      By renting, exchanging, or otherwise disclosing the Personal Reading

Information of its based subscribers, from its headquarters within the State of

Michigan, Crain violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person,
> engaged in the business of selling at retail, renting, or
> lending books or other written materials ... shall not
> disclose to any person, other than the customer, a record
> or information concerning the purchase ... of those
> materials by a customer that indicates the identity of the
> customer.

PPPA § 2.

6.       Accordingly, Plaintiff brings this Class Action Complaint against

Crain for its intentional and unlawful disclosure of its customers' Personal Reading

Information in violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

7.      To supplement its revenues, Crain rents, exchanges, or otherwise

discloses its customers' personal information to data aggregators, data appenders,

data cooperatives, and other third parties without the written consent of any of its

customers.  The information that Crain discloses to each of these various third

parties includes each subscriber's full name, home address, and the title of the

Crain publication(s) to which he or she subscribes (collectively "Personal Reading

Information"), as well as myriad other personal, lifestyle, and demographic

information about the subscriber, such as his or her age, gender, income, the name

of his or her employer, the industry in which the person works, and the list goes on.

8.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Personal Reading Information, Crain is able to disclose the information time and time again to countless third parties.

9.     Crain's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.  In fact, almost any organization can rent a customer list from Crain that contains a number of categories of detailed subscriber information.  For example, anyone could rent a list with the names and addresses of all women over the age of 70 who subscribe to *Autoweek*; such a list would cost approximately $115.00 per thousand names listed.

10.    While Crain profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other personal information in Michigan, it does so at the expense of its customers' privacy and statutory rights because Crain discloses this information from within Michigan and does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

## PARTIES

11.    Plaintiff Gregory Winokur[2] is a natural person and a resident and citizen of Kentucky.  Plaintiff Winokur was a long-time subscriber to *Autoweek* magazine, until the magazine was discontinued in late 2019.  *Autoweek* magazine was published by Crain.  Plaintiff Winokur purchased his subscriptions to *Autoweek* magazine directly from Crain, by sending Crain money to its headquarters in Detroit, Michigan.  Crain collected the money paid to it by Plaintiff Winokur for his *Autoweek* subscriptions in Michigan.  Prior to and at the time he subscribed to *Autoweek*, Crain did not notify Plaintiff Winokur that it discloses the Personal Reading Information of its customers, and Plaintiff Winokur has never authorized Crain to do so.  Furthermore, Plaintiff Winokur was never provided any written notice that Crain rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *Autoweek*, Crain disclosed, from within the State of Michigan, Plaintiff Winokur's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives (who then supplemented that information with data from their own files) – without obtaining consent from or even providing prior notice to Plaintiff Winokur.  At all times after Plaintiff Winokur became an *Autoweek* subscriber but prior to disclosing Plaintiff Lin's Personal Reading Information, Crain was

---

[2] Plaintiff Winokur has also been known as "G.H. Winkour" or "Greg Winokur."

headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore in Michigan at the time it was required to, but did not, notify Plaintiff Winokur that it would disclose his Personal Reading Information.  Likewise, at all times after Plaintiff Winokur became an *Autoweek* subscriber but prior to disclosing Plaintiff Lin's Personal Reading Information, Crain was headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore physically present in Michigan at the time it was required to, but did not, obtain Plaintiff Winokur's consent in Michigan prior to disclosing Plaintiff Winokur's Personal Reading Information from its headquarters in Michigan.  Moreover, also from its headquarters in Michigan, Crain rented or exchanged mailing lists containing Plaintiff Winokur's Personal Reading Information to third parties seeking to contact Crain's subscribers, without first obtaining Plaintiff Winokur's written consent or even giving him prior notice of these rentals, exchanges, and/or other disclosures – informed consent which Crain was likewise required to obtain from Plaintiff Winokur while Crain was headquartered in Michigan, a citizen of Michigan, and physically present in Michigan (and which would have been received by Crain at its corporate headquarters in Detroit, Michigan assuming it had been requested by Crain and provided by Plaintiff Winokur).  Because Crain rented, exchanged, and/or otherwise disclosed Plaintiff Winokur's Personal

7

Reading Information, Plaintiff Winokur has received junk mail from various organizations that do not offer products or services to consumers. Crain disclosed Plaintiff Winokur's Personal Reading Information to these organizations from its headquarters within Michigan. These unwarranted mailings waste Plaintiff Winokur's time, money, and resources. These harassing junk mailings received by Plaintiff Winokur are attributable to Crain's unauthorized rental, exchange, and/or disclosure of his Personal Reading Information from within Michigan, and its failure to seek much less obtain Plaintiff Winokur's informed written consent to such disclosures at a time when it was headquartered in Michigan, a citizen of Michigan, and physically present in Michigan. Because Plaintiff Winokur is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription – money which Plaintiff Winokur sent to, and which Crain collected at, Crain's headquarters in Michigan – Crain's disclosure of his Personal Reading Information deprived Plaintiff Winokur of the full set of benefits to which he was entitled as a part of his *Autoweek* subscription, thereby causing him economic harm. Crain has unjustly retained the money Plaintiff Winokur paid for his *Autoweek* subscription in Michigan, and Plaintiff Winokur is informed and believes that such money has been deposited by Crain into a bank account held at a financial institution located in Michigan. Accordingly, what Plaintiff Winokur received (a subscription without statutory privacy protections)

8

was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *Autoweek* subscription had he known that Crain would disclose his Personal Reading Information.

12.    Defendant Crain Communications Inc. is a multi-industry publishing conglomerate. Crain is incorporated in Delaware and maintains its corporate headquarters and principal place of business at 1155 Gratiot Ave, Detroit, Michigan 48207-2732.  Crain published *Autoweek* until the magazine was discontinued in late 2019.  Crain does business throughout Michigan and the United States.

## JURISDICTION AND VENUE

13.    The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy for each claim alleged herein exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.    Personal jurisdiction and venue are proper because Crain because Crain maintains its corporate headquarters and principal place of business in Detroit, Michigan and within this District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

15.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

16.     Recognizing the need to further protect consumers' privacy rights, Michigan's legislature enacted the PPPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

17.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

10

PPPA § 2 (emphasis added).

18.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

19.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

20.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

21.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private

11

matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

22.     Despite the fact that Crain maintains its corporate headquarters and principal place of business in Michigan, and is thus a citizen of the State of Michigan, Crain has disregarded its legal responsibilities under the PPPA by systematically selling, renting, and otherwise disclosing all of its subscribers' Personal Reading Information from within the State of Michigan.

### The Personal Information Market: Consumers' Personal Information Has Real Value

23.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

24.     More than a decade later, Commissioner Swindle's comments ring

---

[3] The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Jan. 29, 2019).

truer than ever, as consumer data feeds an information marketplace that supports a

$26 billion dollar per year online advertising industry in the United States.[4]

25.     The FTC has also recognized that consumer data possesses inherent

monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types
> and amount of information collected by businesses, or
> why their information may be commercially valuable.
> Data is currency. The larger the data set, the greater
> potential for analysis—and profit.[5]

26.     In fact, an entire industry exists while companies known as data

aggregators purchase, trade, and collect massive databases of information about

consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

information in an open and largely unregulated market.[6]

27.     The scope of data aggregators' knowledge about consumers is

immense:  "If you are an American adult, the odds are that [they] know[] things

---

[4] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html (last visited Jan. 29, 2019).

[5] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at
2,  *available at*
https://www.ftc.gov/sites/default/files/documents/public_statements/remark
s-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last
visited Jan. 29, 2019) (emphasis added).

[6] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*,
TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-
knows-what-youre-doing-right-now/ (last visited Jan. 29, 2019).

like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

28.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

29.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[9]

30.     In their letter, the co-Chairmen recognized that:

---

[7] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Jan. 29, 2019).

[8] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Jan. 29, 2019).

[9] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Jan. 29, 2019).

By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[10]

31.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Crain share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[12]

32.     Information disclosures like Crain's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say,

---

[10] *Id.*

[11] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Jan. 29, 2019).

[12] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Jan. 29, 2019).

because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14]

33.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Crain's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

34.     Crain is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

---

[13] *Id.*

[14] *Fraud Against Seniors:  Hearing before the Senate Special Committee on  Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Jan. 29, 2019).

[15] *See id.*

35.     Thus, as consumer data has become an ever-more valuable

commodity, the data mining industry has experienced rapid and massive growth.

Unfortunately for consumers, this growth has come at the expense of their most

basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

36.     As the data aggregation and cooperative industry has grown, so too

have consumer concerns regarding the privacy of their personal information.

37.     A recent survey conducted by Harris Interactive on behalf of

TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business

with companies who they believe do not protect their privacy online.[16]  As a result,

81 percent of smartphone users polled said that they avoid using smartphone apps

that they don't believe protect their privacy online.[17]

38.     Thus, as consumer privacy concerns grow, consumers are

increasingly incorporating privacy concerns and values into their purchasing

decisions and companies viewed as having weaker privacy protections are forced

---

[16] See 2014 TRUSTe US Consumer Confidence Privacy Report, TRUSTe,
http://www.theagitator.net/wp-
content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Jan.
29, 2019).

[17] Id.

to offer greater value elsewhere (through better quality and/or lower prices) than
their privacy- protective competitors.

39.     In fact, consumers' personal information has become such a valuable
commodity that companies are beginning to offer individuals the opportunity to
sell their personal information themselves.[18]

40.     These companies' business models capitalize on a fundamental tenet
underlying the personal information marketplace:  consumers recognize the
economic value of their private data.  Research shows that consumers are willing to
pay a premium to purchase services from companies that adhere to more stringent
policies of protecting their personal data.[19]

41.     Thus, in today's economy, individuals and businesses alike place a
real, quantifiable value on consumer data and corresponding privacy rights.[20]  As

---

[18] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at*
http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Jan. 29, 2019).

[19] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at*
https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Jan. 29, 2019).

[20] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at*
http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&ty

such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *Crain Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information*

42.     Crain maintains a vast digital database comprised of all of its customers' Personal Reading Information.  Crain discloses its customers' Personal Reading Information, from its headquarters in Detroit, Michigan, to data aggregators and appenders who then supplement that information with additional information about Crain's customers, including such intimate and highly-detailed demographic and personal information as its subscribers' ages, genders, incomes, the names of their employers, the industries in which they work, and the list goes on.

43.     Crain then rents and/or exchanges, also from its corporate headquarters in Detroit, Michigan, mailing lists for its various publications— which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, marketing companies, and

---

pe=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

organizations soliciting donations.

44.     Crain also discloses its customers' Personal Reading Information,
again from its corporate headquarters in Detroit, Michigan, to data cooperatives,
who in turn give Crain access to their own mailing list databases, which Crain
receives and then accesses in Michigan.

45.     As a result of Crain's data compiling and sharing practices – all of
which occurs in the State of Michigan – companies can purchase and/or obtain
mailing lists from Crain that identify Crain customers by their most intimate
details.  Crain's disclosure of such sensitive and personal information puts
consumers, especially the more vulnerable members of society, at risk of serious
harm from scammers.  For example, Crain will rent a list – to anyone willing to
pay for it – containing the names and addresses of all women over the age of 70
who subscribe to *Autoweek* magazine; such a list would cost approximately
$115.00 per thousand names listed.

46.     Crain does not seek its customers' prior written consent to any of
these disclosures and its customers remain unaware that their Personal Reading
Information and other sensitive personal information is being rented and
exchanged on the open market.

47.     At all times prior to disclosing its customers' Personal Reading
Information, Crain was headquartered in Michigan with its principal place of

business in Michigan, and was physically present in Michigan at the time it was required to, but did not, obtain its customers' informed consent prior to disclosing all of their Personal Reading Information from its headquarters in Michigan. Moreover, also from its headquarters in Michigan, Crain rented or exchanged mailing lists containing all of its customers' Personal Reading Information to third parties seeking to contact Crain's subscribers, without first obtaining any of its customers' written consent or even giving them prior notice of these rentals, exchanges, and/or other disclosures – informed consent which Crain was likewise required to obtain from its customers while Crain was headquartered within, a citizen of, and physically present in Michigan (and which would have been received by Crain at its corporate headquarters in Detroit, Michigan had it been requested by Crain and provided by Plaintiff).

48.     Consumers can purchase *Autoweek* and Crain's various other publications from Crain through numerous media outlets, including the Internet, telephone, or traditional mail, and by remitting payment to Crain which is thereafter received by Crain in Michigan.  Regardless of how the consumer subscribes, Crain never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Crain has uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Personal Reading Information

from within Michigan.

49.    As a result, Crain disclosed its customers' Personal Reading

Information – including their reading habits and preferences that can "reveal

intimate facts about our lives, from our political and religious beliefs to our health

concerns"[21] – to anybody willing to pay for it from within Michigan.

50.    By and through these actions, Crain has intentionally disclosed, from

within Michigan, its customers' Personal Reading Information to various third

parties, without the requisite consent of its customers, in direct violation of the

PPPA.

## **CLASS ACTION ALLEGATIONS**

51.    Plaintiff seeks to represent a class defined as all individuals in the

United States who, before July 30, 2016, had their Personal Reading Information

pertaining to *Autoweek* magazine disclosed to third parties by Crain

Communications Inc. without consent (the "Class").  Excluded from the Class is

any entity in which the Defendant has a controlling interest, as well as all officers

and directors of Defendant.

52.    Members of the Class are so numerous that their individual joinder

herein is impracticable.  On information and belief, members of the Class number

---

[21] *California's Reader Privacy Act Signed into Law*, Electronic Frontier
Foundation (Oct. 3,
2011), https://www.eff.org/press/archives/2011/10/03 (last visited Jan. 29, 2019).

in the thousands.  The precise number of Class members and their identities are

unknown to Plaintiff at this time but may be determined through discovery.  Class

members may be notified of the pendency of this action by mail and/or publication

through the distribution records of Defendant.

53.     Common questions of law and fact exist as to all Class members and

predominate over questions affecting only individual Class members.  Common

legal and factual questions include, but are not limited to:  (a) whether Crain is a

"retailer or distributor" of publications (*i.e.*, magazines); (b) whether Crain

obtained consent before disclosing to third parties Plaintiff's and the Class's

Personal Reading Information; (c) whether Crain's disclosures of Plaintiff's and

the Class's Personal Reading Information violated the PPPA in Michigan; and (d)

whether Crain's rental, exchange, and/or disclosure of Plaintiff's and the Class's

Personal reading Information constitutes unjust enrichment..

54.     The claims of the named Plaintiff are typical of the claims of the Class

in that the named Plaintiff and the Class sustained damages as a result of

Defendant's uniform wrongful conduct, based upon Defendant's disclosure of

Plaintiff's and the Class's Personal Reading Information.

55.     Plaintiff is an adequate representative of the Class because his

interests do not conflict with the interests of the Class members he seeks to

represent, he has retained competent counsel experienced in prosecuting class

actions, and they intend to prosecute this action vigorously.  The interests of Class

members will be fairly and adequately protected by Plaintiff and his counsel.

56.     The class mechanism is superior to other available means for the fair

and efficient adjudication of the claims of Class members.  Each individual Class

member may lack the resources to undergo the burden and expense of individual

prosecution of the complex and extensive litigation necessary to establish

Defendant's liability.  Individualized litigation increases the delay and expense to

all parties and multiplies the burden on the judicial system presented by the

complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the

class action device presents far fewer management difficulties and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision

by a single court on the issue of Defendant's liability.  Class treatment of the

liability issues will ensure that all claims and claimants are before this Court for

consistent adjudication of the liability issues.

### COUNT I
### Violation of the Preservation of Personal Privacy Act
### (PPPA § 2)

57.     Plaintiff repeats the allegations contained in the foregoing paragraphs

as if fully set forth herein.

58.     Plaintiff bring this claim individually and on behalf of members of the

24

Class against Crain Communications Inc.

59.    Crain oversaw the publishing of *Autoweek* magazine from within Michigan.

60.    Crain oversaw the sale of subscriptions to *Autoweek* magazine from within Michigan.

61.    Crain collected the money that its customers pay for subscriptions to *Autoweek* magazine within Michigan.

62.    Plaintiff is informed and believes, and thereupon alleges, that Crain collected in Michigan and thereafter deposited in Michigan the money that it received from its customers (including *Autoweek* subscribers) into bank accounts held at financial institutions in Michigan.

63.    Crain sendt to customers their issues of *Autoweek* magazine from Michigan, and/or oversaw such mailings pertaining to all of its publications from within Michigan.

64.    Crain interacted and communicated with its customers from its corporate headquarters in Michigan. Crain has been a citizen of Michigan, headquartered in Michigan, and physically present in Michigan at all times relevant to this action, including prior to disclosing and at the time it disclosed all of its customers' Personal Reading Information from within Michigan. Accordingly, prior to disclosing its customers' Personal Reading Information from

within Michigan, Crain could have, from and while present in Michigan, provided notice to its customers to inform its customers that it would be disclosing their Personal Reading Information, but it failed to do so.  Likewise, prior to disclosing its customers' Personal Reading Information from within Michigan, Crain could have, from and while present in Michigan, obtained its customers consent to its disclosures of their Personal Reading Information from within Michigan.

65.    As a publisher that sells subscriptions to magazines and other publications to consumers, Crain is engaged in the business of selling written materials at retail from within Michigan.  *See* PPPA § 2.

66.    By purchasing a subscription to *Autoweek* magazine, Plaintiff purchased written materials directly from Crain.  *See* PPPA § 2.

67.    Because Plaintiff purchased written materials directly from Crain, he his a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

68.    At various times before July 30, 2016, Crain disclosed Plaintiff's Personal Reading Information, which identified him as an *Autoweek* magazine subscriber and customer, in at least three ways, all from its corporate headquarters within Michigan.

69.    First, Crain disclosed, from within Michigan, mailing lists containing Plaintiff's Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from

their own databases, before sending the mailing lists back to Crain in Michigan, which Crain received in Michigan.

70.    Second, Crain disclosed, from within Michigan, mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn gave Crain access to their own mailing list databases, which Crain accessed in Michigan.

71.    Third, Crain rented and/or exchanged, from within Michigan, its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work.

72.    All of the money that Crain received from the third parties to whom it disclosed Plaintiff's Personal Reading Information was sent to Crain's headquarters in Michigan and was received by Crain at its headquarters in Michigan.

73.    Because the mailing lists Crain disclosed from within Michigan included additional personal and demographic information from data aggregators and appenders, the lists were more valuable, and Crain was able to increase its profits gained from the mailing list rentals and/or exchanges, profits Crain received in Michigan.

74.     By renting, exchanging, or otherwise disclosing its customer lists, from within Michigan, Crain disclosed to persons other than Plaintiff, from within Michigan, records or information concerning their purchase of written materials from Crain.  *See* PPPA § 2.  All of Crain's records concerning Plaintiff's purchase of written materials that were disclosed by Crain were, prior to their disclosure, stored by and accessible to Crain in its headquarters in Michigan. Accordingly, Crain's disclosures of Plaintiff's Personal Reading Information originated from within Michigan.

75.     The information Crain disclosed from its headquarters in Michigan indicated Plaintiff's name and address, as well as the fact that he subscribed *Autoweek*.  Accordingly, the records or information disclosed by Crain from within Michigan indicated Plaintiff's identities.  *See* PPPA § 2.

76.     Plaintiff and the members of the Class never consented to Crain disclosing their Personal Reading Information to anyone.

77.     Worse yet, Plaintiff and the members of the Class did not receive notice before Crain disclosed their Personal Reading Information to third parties.

78.     Crain's disclosures of Plaintiff's and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

79.     Crain's disclosures of Plaintiff's and the Class's Personal Reading

Information were not made to collect payment for their subscriptions.

80.     Crain's disclosures of Plaintiff's Personal Reading Information originated from within Michigan and were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work—all in order to increase Crain's revenue and profit, which is subject to taxation by the State of Michigan. Accordingly, Crain's disclosures of its customers' Personal Reading Information in Michigan were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

81.     By disclosing Plaintiff's Personal Reading Information from within Michigan, while it was headquartered in and a citizen of Michigan, Crain invaded Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits in violation of the PPPA from within Michigan. *See* PPPA § 2.

82.     Additionally, because Plaintiff and the members of the Class paid for their subscriptions to Crain's publications by remitting payments to Crain that were received by Crain in Michigan, and because Crain was obligated to comply with the PPPA in Michigan, Crain's unlawful disclosures of Plaintiff's and the other Class members' Personal Reading Information from within Michigan deprived Plaintiff and the Class members of the full value of their paid-for subscriptions. Because Plaintiff and the other Class members ascribe monetary value to the

privacy of their Personal Reading Information, Crain's unlawful rental, exchange, and/or other disclosure of their Personal Reading Information from within Michigan, coupled with Crain's retention in Michigan of the money that Plaintiff and the Class paid for their subscriptions, caused Plaintiff and the unnamed members of the Class to receive less value than they paid for, thereby causing them economic harm.

83.    Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine publication subscription that keeps their Personal Reading Information private is more valuable than one that does not.

84.    Accordingly, had Plaintiff been adequately informed of Crain's disclosure practices from within Michigan – information which Crain could and should have provided to Plaintiff from within Michigan – Plaintiff would not have been willing to purchase his *Autoweek* subscriptions at the price charged, if at all, and thus would not have remitted payment for such subscription to Crain's headquarters in Michigan.  Thus, Crain's unlawful disclosures from within Michigan and its unlawful retention of Plaintiff's money in Michigan caused Plaintiff economic harm.

85.    Crain's disclosure of Plaintiff's Personal Reading Information to third parties from within Michigan has also caused an influx of third-party print

advertisements.

86.     As a result of Crain's unlawful disclosures of their Personal Reading

Information from within Michigan, Plaintiff and the members of the Class have

suffered privacy and economic injuries. On behalf of himself and the Class,

Plaintiff seeks: (1) actual damages, including disgorgement, or $5,000.00,

whichever is greater, per Class member pursuant to PPPA § 5(a); and (2) costs and

reasonable attorneys' fees pursuant to PPPA § 5(b).

## COUNT II
### Unjust Enrichment

87.     Plaintiff repeats the allegations contained in the paragraphs above as if

fully set forth herein.

88.     Plaintiff bring this claim individually and on behalf of members of the

Class against Crain Communications Inc.

89.     Plaintiff and the Class members conferred benefits on Crain in

Michigan by providing Crain with their Personal Reading Information (which

Crain received and stored in Michigan) and by paying Crain for their magazine

publication subscriptions with money (which Crain likewise received, deposited,

and has retained in Michigan).

90.     Crain received and retained, in Michigan, the information and money

belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to

Crain's publications and provided such information and money to Crain in

Michigan.

91.     Because Crain received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information in Michigan, and because Crain has employees and/or agents handling customer accounts and billing as well as customer data in Michigan, Crain appreciates or has knowledge of such benefits, which it received in Michigan.

92.     Under the PPPA, Plaintiff and the Class members were entitled to have Crain keep confidential their Personal Reading Information – collected and stored by Crain in Michigan – as part of their subscriptions to publications that Crain, a Michigan citizen, published from within Michigan.

93.     Under principles of equity and good conscience, because Crain failed to comply with the PPPA from within Michigan, Crain should not be allowed to retain in Michigan the full amount of money that Plaintiff and the Class paid to and was collected, received, and held by Crain in Michigan for their subscriptions, nor should Crain be allowed to retain the money that Crain collected and received in Michigan by renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information from within Michigan.

94.     Moreover, Crain should not be allowed to retain the monies it collected, received, and has thereafter held in Michigan as a result of renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal

Reading Information from within Michigan.

95.    Plaintiff and the other Class members have suffered actual damages as a result of Crain's unlawful conduct committed in Michigan, in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information, information which was collected, stored, accessed, and thereafter routinely disclosed from within Michigan, by a Michigan-based publisher, in return for money that it received in Michigan from the various third-party recipients of such information.  This amount is tangible, is believed to be held in Michigan-based bank accounts, and will be calculated at trial.

96.    Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Crain's failure to inform them that it would disclose their Personal Reading Information, failures which occurred in Michigan, caused them to purchase magazine publication subscriptions when they otherwise would not have.

97.    Further, a portion of the purchase price of each Crain magazine subscription sold by Crain from within Michigan to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the PPPA.  Because Plaintiff and the other Class members were denied services that they paid for,

should have been provided by Crain from within Michigan, and were entitled to receive in Michigan—i.e., the confidentiality of their Personal Reading Information kept by a Michigan-based published in its corporate headquarters in Michigan—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages that have presently being unjustly retained by Crain in Michigan.

98.     To prevent inequity, Crain should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived by Crain in Michigan from Crain's rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information from within Michigan.

99.     Accordingly, Plaintiff and the Class members seek an order declaring that Crain's conduct in Michigan constitutes unjust enrichment in Michigan, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained in Michigan by Crain through its rentals, exchanges, and/or other disclosures, all of which occurred from within Michigan, of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.   For an order certifying the Class under Rule 23 of the
     Federal Rules of Civil Procedure and naming Plaintiff as
     representative of the Class and Plaintiff's attorneys as
     Class Counsel to represent the Class;

B.   For an order declaring that Defendant's conduct as
     described herein violates the Preservation of Personal
     Privacy Act, PPPA, in Michigan;

C.   For an order finding in favor of Plaintiff and the Class on
     all counts asserted herein;

D.   For an award of actual damages or $5,000, whichever is
     greater, to Plaintiff and each Class member, as provided by
     the Preservation of Personal Privacy Act, PPPA § 5(a);

E.   For prejudgment interest on all amounts awarded;

F.   For an order of restitution and all other forms of equitable
     monetary relief;

G.   For an order awarding Plaintiff and the Class their
     reasonable attorneys' fees and expenses and costs of suit.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: December 23, 2020                    Respectfully submitted,

                                            **PLAINTIFF GREGORY WINKOUR**,

                                            By:  */s Philip L. Fraietta*
                                            One of Plaintiff's Attorneys

                                            Frank S. Hedin
                                            fhedin@hedinhall.com
                                            HEDIN HALL LLP
                                            1395 Brickell Avenue, Suite 900
                                            Miami, Florida 33131

35

Tel: 305.357.2107
Fax: 305.200.8801

Joseph I. Marchese
jmarchese@bursor.com
Philip L. Fraietta
pfraietta@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Nick Suciu III
nicksuciu@bmslawyers.com
BARBAT, MANSOUR & SUCIU PLLC
1644 Bracken Road
Bloomfield Hills, Michigan 48302
Tel: 313.303.3472

*Counsel for Plaintiff*